IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00158 REB-JMC

UNITED STATES OF AMERICA,

Plaintiff,

v.

CORBAN ELMORE.

Defendant.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**James M. Candelaria, United States Magistrate Judge**.

This matter is before the Court on Defendant's Motion To Suppress docket #25.  Pursuant

to 28 U.S.C. §636(b)(1) and D.C. Colo.L.Civ.R. 72.1(C)(3), the Motion has been referred to this

Court for recommendation [docket # 26]. The Court has reviewed the relevant Motion,

Plaintiff's Response, Defendant's Reply, held a hearing and considered the testimony of

witnesses, reviewed the entire case file, and the applicable law and is sufficiently advised in the

premises.

For the reasons that follow, the Court **RECOMMENDS** Defendant's Motion to Suppress

evidence be **GRANTED** in its entirety.

I.        History

On April 6, 2021, in Archuleta County, Colorado, deputies from the Archuleta County

Sheriff's Office, officers from the Southern Ute Police Department and first responders from the

Los Pinos Emergency Medical Service were dispatched to 391 Sunset Trail, Arboles, Colorado a

1

rural address in Archuleta County, Colorado.  The dispatch was in reference to a possible drug

overdose of a 17-year-old male ("L.E.") who had been found by his father, the Defendant, in a

bedroom at 391 Sunset Trail (Defendant's residence) in a state of unconsciousness and not

breathing.  Defendant immediately summoned the assistance of David Wilson who was living in

a recreational vehicle ("RV") parked on the Defendant's property.  Mr. Wilson went into

Defendant's home and downstairs into L.E.'s bedroom and began administering chest

compressions and resuscitation efforts on L.E.  Shortly thereafter, Mr. Wilson turned over the

CPR duties to Defendant and exited Defendant's home and ran to his RV to get his phone and

call 911.  At some point while Mr. Wilson was calling 911, Defendant dragged[1] L.E. from the

bedroom in the house to a sidewalk area outside of the house and in front of the main entrance.

   While Defendant and Mr. Wilson were continuing attempts to revive L.E., a Southern Ute

Police Officer arrived and quickly administered Narcan to L.E.  By this time EMS officers from

Los Pinos arrived and took over revival efforts. Through the efforts of everyone, L.E. began to

breath again and gain consciousness.  A Los Pinos Paramedic ("EMS Mattison") questioned L.E.

regarding what substances he had ingested but L.E. was not coherent enough to provide any

information.  EMS Mattison then asked Defendant if he knew what L.E. had taken and

Defendant escorted EMS Mattison into the residence and down to the bedroom where Defendant

had earlier found L.E. unresponsive.  EMS Mattison testified that Defendant pointed toward a

metal box that was on a bed and informed him that it was L.E.'s box.  EMS Mattison looked

inside the box and testified that there were vials of narcotics and assorted items of drug

paraphernalia.  Most notably, the vials contained Propofal, Fentynal, Promethazine and

Midszolam.  EMS Mattison further testified he had never seen those drugs in those type of

---

[1] Body Cam footage entered into evidence recorded that Mr. Wilson used the word "drug" when
referring to Defendant moving L.E. out of the house.

containers outside a surgical setting in a hospital. EMS Mattison took possession of the metal box and kept possession of the metal box until handing it over to hospital personnel upon the arrival of L.E. at the hospital.

Shortly after EMS departed from Defendant's residence and headed to the hospital, Deputy Hibbert and Deputy Civiletto of the Archuleta County Sheriff's Department arrived on scene. By this time, EMS personnel were enroute to the Hospital with L.E. and Defendant had followed the ambulance in a separate vehicle. The two deputies learned from a remaining Southern Ute officer that L.E. had been administered Narcan. Both officers also learned from Mr. Wilson, who also remained on the property, that Defendant had asked Mr. Wilson to assist Defendant with his son L.E. Mr. Wilson went into Defendant's home and noticed L.E. had no pulse and he began providing CPR. Mr. Wilson then turned over compressions to Defendant so that Mr. Wilson could go get his phone and call 911. While the officers were speaking with Mr. Wilson, Detective Smith of the Archuleta Sheriff's Department arrived on scene and deputies Hibbert and Civiletto relayed the information they learned from Mr. Wilson to Detective Smith. Detective Smith also spoke with Mr. Wilson. Detective Smith testified, and the body camera footage supported, that he learned from speaking with Mr. Wilson that Defendant had dragged L.E. from the bedroom downstairs to out on the sidewalk in front of the residence prior to any emergency personnel arriving on scene.

At this point in time, the information the investigating officers had was that there was a suspected overdose by L.E., revival efforts were undertaken by Mr. Wilson and Defendant, Narcan was administered to L.E. by an SUPD officer, L.E. had a reported history of drug abuse, and Defendant had moved L.E. from inside the house to out in front of the house before emergency personnel arrived. The officers also learned from Mr. Wilson that L.E. had not lived

with Defendant for very long and Mr. Wilson further indicated he had lived on the property for about 4 months and did not witness any instances of drugs or drug use in or around the Defendant's residence. At the conclusion of speaking with Mr. Wilson, Detective Smith had the two deputies secure Defendant's residence as a crime scene and thereby prohibit access to the residence by anyone while Detective Smith investigated further. Detective Smith then departed the area and headed for the hospital. Only the deputies and Mr. Wilson remained on the property. It was unclear from the police reports and testimony what time the residence was secured by the deputies, but this Court finds it would have been approximately 11:30 a.m. Defendant's residence is in a very rural part of Archuleta County and testimony revealed it was about an hour away from the hospital where L.E. was taken.

Detective Smith arrived at the hospital and at approximately 1:00 p.m. learned from a nurse that when L.E. arrived at the hospital EMS Mattison had provided a metal box that contained the substances L.E. was suspected of having ingested. Up until that point in time, none of the investigating officers had any information as to the type of substances L.E. ingested or the vials the substances were in. After taking possession of the metal box and its contents, Detective Smith continued his investigation and learned the hospital pharmacy staff had confirmed the vials in the metal box contained the substances as labeled on the vials.

At approximately 1:30 p.m. Jessica Hayes, Defendant's purported common law wife, arrived at Defendant's residence and wanted to enter the residence. Deputies Hibbert and Civiletto denied Ms. Hayes entry telling her it was a crime scene, and a search warrant was being pursued. Ms. Hayes asked if she could just go in to lie down as she was recovering from injuring her foot and had just been released from the hospital herself. She was told no. She asked if she could go

into the residence to make sure her dogs had food and water.  She was told no but the deputies made clear to her that she was free to stay or go, she just could not go into the residence.

Around 2:00 p.m. Detective Smith arrived at Defendant's residence for the second time. Detective Smith spoke with Ms. Hayes outside of the residence and asked if she would provide consent to search the residence.  Ms. Hayes did not provide consent and she eventually left the residence after being denied entry.   Detective Smith remained at the residence for a short time after Ms. Hayes' departure waiting for Defendant to arrive.  Detective Smith, while at the hospital, had contacted Defendant by telephone and arranged to meet with Defendant at the residence to interview him and possibly get his consent to search the residence. However, Defendant failed to appear.

Detective Smith's testimony, corroborated by his report, indicates while Detective Smith continued to wait for Defendant to arrive, he spoke to EMS Mattison by telephone at approximately 3.05 p.m.  Through that phone call, Detective Smith learned the circumstances of EMS Mattison's taking possession of the substances from the bedroom in Defendant's residence. EMS Mattison further relayed that in his experience the substances possessed and vials they were in are rarely seen outside of a surgical hospital setting.  After speaking with EMS Mattison Detective Smith left the Defendant's residence to head back to the Archuleta County Sheriff's Office to continue his investigation and apply for a search warrant.  The two deputies remained at Defendant's residence to keep it secure until they heard back from Detective Smith.

At some point after Detective Smith's departure, Defendant came back to his residence where he was denied access by the deputies and informed it was a crime scene and a search warrant was being sought.   Unable to access his residence, Defendant told the deputies he was going to go to the hospital to see L.E. and got into a pickup truck parked out in front of the

5

residence and started it up.  The body cam footage shows the deputies looked at each other and after a brief moment approached the pickup and told Defendant they needed to do a sweep of the pickup before he could take it.  Defendant, who was in the driver's seat with the pickup running and the window down asked why they needed to do a sweep.  Again, he was informed by the deputies that it was part of the crime scene and they needed to sweep it for officer safety before he could take it.  Defendant told the deputies that he was not the primary driver of the pickup and did not want to get into trouble for anything that might be in it.[2]  Defendant then shut off the pickup and exited it without allowing consent for the deputies to "sweep" it.  Thereafter, Defendant departed the area.

At some point thereafter, Deputy Hibbert began taking pictures of the exterior of Defendant's residence and relayed to Detective Smith, who was at the Sheriff's office, that there may be a firearm in the pickup and while taking pictures of the Defendant's residence he saw through a window what appeared to be a gun safe and a long gun case.  Detective Smith then ran Defendant's criminal history and learned Defendant was a prohibited from possession of firearms.

Around 8:50 p.m. Detective Smith returned to Defendant's residence with a search warrant and a search was conducted of the residence and the pickup.  The search of the residence produced several firearms, ammunition, magazines for handguns and narcotic related equipment.

---

[2] Deputy Hibbert reported Defendant then told him there may be a firearm in the pickup. This is highly disputed by Defendant and review of audio from the body cam footage was inconclusive. This Court finds that Deputy Hibbert's lack of a reaction to allegedly learning of a firearm in Defendant's pickup while Defendant is sitting in the pickup coupled with Deputy Hibbert's contemporaneous telephone conversation with Detective Smith where the most pressing item on Deputy Hibbert's mind was having Detective Smith bring antelope jerky and a Monster drink for him and Deputy Civiletto, and not the fact that he just learned there may be a firearm in the pickup supports Defendant's claim that he did not tell the deputies there may be a firearm in the pickup.

A search of the pickup did not produce any firearms, but drug related paraphernalia was found in the pickup.

## II.     Legal Standard

On a motion to suppress, the government has the ultimate burden to show compliance with the fourth amendment. *United States v. Torres,* 987 F.3d 893, 898 (10th Cir. 2021). The fourth amendment states that "the right of the people to be secure in their . . . houses, papers and effects against unreasonable seizures . . . shall not be violated. *U.S. CONST. amend. IV.* A person's house within the meaning of the fourth amendment appears to include a person's residence whether he owns or rents it. *See Segura v. United States*, 468 U.S. 796, 806 (1984). For purposes of the fourth amendment "a 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 109-26 (1984). The burden is on the defendant seeking to suppress evidence based on a warrantless seizure of his property to demonstrate that such a seizure occurred. *United States v. Shrum*, 908 F.3d 1219 (10th Cir. 2018). Once defendant satisfies his initial burden then the burden shifts to the government to establish the warrantless seizure was reasonable. *See id.*

## III.     Analysis

Defendant seeks suppression of all evidence acquired from a search of his residence and vehicle conducted pursuant to a State of Colorado warrant. Defendant raises three issues in his Motion to Suppress (a) he is intitled to immunity from prosecution and investigation pursuant to Colorado Revised Statute § 18-1-711; (b) the warrantless seizure of his dwelling and automobile

was illegal; and (c) that the affidavit for the search warrant contained false statements and

omitted material facts.

A.       The Applicability of Colorado Revised Statute § 18-1-711.

The pertinent sections of Colorado Revised Statute §18-1-711 are as follows:

> (1) A person is immune from arrest and prosecution for an offense described in
> subsection (3) of this section if: (a) a person reports in good faith an emergency drug or
> alcohol overdose event to law enforcement officer, to the 911 system, or to a medical
> provider; (b) the person remains at the scene of the event until law enforcement officer or
> emergency medical responder arrives . . . ; (c) the person identifies himself or herself to,
> and cooperates with, the law enforcement officer, emergency medical responder, or
> medical provider; and (d) the offense arises from the same course of events from which
> the emergency drug or alcohol overdose arose.
> . . .
> (3)  The immunity described in subsection (1) of this section shall apply to the following
> criminal offenses: (a) unlawful possession of a controlled substance, . . . (b) Unlawful use
> of a controlled substance . . . (g) Possession of drug paraphernalia . . . .
> (4)  Nothing in this section shall be interpreted to prohibit the prosecution of a person for
> an offense other than an offense listed in subsection (3)  of this section or to limit the
> ability of a district attorney or law enforcement officer to obtain or use evidence obtained
> from a report, recording or any other statement provided pursuant to subsection (1) of this
> section to investigate and prosecute an offense other than an offense listed in subsection
> (3). . . .

The Government does not argue that Defendant failed to comply with any of the provisions

in subsection (1) of the statute, rather the Government contends the above statute does not apply

because Defendant is charged with violations of federal offenses not offenses that are explicit in

subsection (3).  The government relies on the language in subsection (4) that allows for

prosecution of offenses other than those listed in subsection (3).  However, this Court finds the

Government's application of subsection (4) too simplistic and fails to take into account how the

Government arrived at the charges the Defendant now faces.

It is undisputed that law enforcement's involvement started with a call to 911 to report the

overdose of L.E.   When the investigating law enforcement agency arrived at Defendant's

residence all emergency medical personnel had left, L.E. was being transported to the hospital and Defendant had left to the hospital.  The Defendant's residence was closed and no one was inside.  At this point in time, law enforcement learned that L.E. was a juvenile and Defendant was L.E.'s father, L.E. had overdosed and Narcan was administered by a law enforcement officer, L.E. had not lived at the residence for very long, Mr. Wilson (who lived on Defendant's property in a separate recreational vehicle) assisted Defendant in administering CPR while in L.E.'s bedroom, and when Mr. Wilson left L.E.'s bedroom to call 911 Defendant dragged L.E. out of the house and onto a sidewalk in front of the entrance to the residence.   Mr. Wilson further relayed that he had not seen any drugs or drug activity in or at the Defendant's residence for the period of about four months that Mr. Wilson had been living on Defendant's property. The Government argues that the above information provided probable cause to seize Defendant's residence without a warrant while anticipation of securing a search warrant for the residence. Defendant contends that law enforcement reliance on any probable cause based on the above facts to seize Defendant's residence without a warrant is prohibited by C.R.S. § 18-1-711(3).

Probable cause is judged considering the totality of the circumstances. *See Illinois v. Gates,* 462 U.S. 213, 238 (1983).  "[P]robable cause is not a high bar.  Officers need only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Hinkle v. Beckham Cty. Bd. Of Cty Commissioners,* 962 F.3d 1204, 1220 (10th Cir. 2020).  Probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance of evidence standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt." *Id. (quoting Gerstein v. Pugh,* 420 U.S. 103, 121 (1975)).

It is undisputed that the two deputies at the direction of Detective Smith seized Defendant's residence and vehicle without a warrant shortly after their arrival at Defendant's residence.   This Court finds that based on the facts known to the officers at the time of the seizure probable cause existed to believe there may be evidence of a crime in Defendant's residence.[3]  However, those facts only give rise to probable cause of use and possession of controlled substances which is expressly listed in C.R.S. § 18-1-711(3) as an offense to which Defendant is granted immunity.

The other crimes listed in the Affidavit as reasons provided by law enforcement for probable cause to seize Defendant's residence and vehicle and thereafter search Defendant's residence and vehicle were:  C.R.S. § 18-18-405 Unlawful distribution, manufacturing, dispensing, sale or possession of a controlled substance; C.R.S. § 18-18-415 Prescription Fraud; and C.R.S. 18-12-108 Possession of Weapons by Previous Offenders.  None of those crimes fall under the protections set forth in subsection (3), but the facts that support those charges were not known to law enforcement at the time Defendant's residence was seized and therefore are not considered in determining whether the seizure was legal. *See United States v. Cantu,* 405 F.3d 1173, 1178 (10th Cir. 2005) (The initial legality of a seizure turns on the facts and circumstances known to the police at the time of the seizure rather than on the facts and circumstances subsequently discovered.).

The question then becomes is a seizure by a state law enforcement agency based on probable cause for a crime expressly listed as being immune from prosecution under C.R.S. § 18-7-711(3) valid?  This Court answers in the negative because the facts that support probable cause at the time of the seizure only support probable cause for crimes included in C.R.S. § 18-1-711(3)

---

[3] This finding is based on the Affidavit, in court testimony of witnesses and exhibits received in the court record.

wherein Defendant is afforded immunity, and therefore, *ispo facto* law enforcement cannot seize Defendant's residence.

The Government argues that even though the residence was secured immediately after law enforcement arrived, the securing of the residence was justified to prevent the destruction or removal of evidence while a search warrant was obtained. The Government cites *Segura v. United States,* 468 U.S. 796, 810 (1984) for the proposition that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents.  *See Id.* The Government further contends the that the temporary warrantless seizure of Defendant's residence was permissible pursuant to the four-part test set forth in *Shrum.*  In *Shrum*, the Tenth Circuit Court held where: (1) the police have probable cause that defendant's property contained evidence of a crime; (2) the police had reason to fear the defendant might destroy the evidence; (3) the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy; and (4) the police excluded the defendant from his trailer for a limited time. *See id.* at 1231.  Defendant agrees that the *Shrum* test is applicable but disagrees that law enforcement had probable cause or that police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy or that the police excluded the Defendant from his residence for a limited time.  Because this court finds permissible probable cause was absent at the initial seizure, this Court need not address the issue as to whether the Government complied with the remaining factors set forth in *Shrum*.[4]

---

[4] Defendant argues suppression based on false statements of material facts in the affidavit for the search warrant.  Because this Court finds there was no probable cause to seize Defendant's residence, this Court need not address whether the search warrant obtained subsequent to the seizure suffered from infirmities warranting suppression of evidence.

B.    The Timing of the Seizure is Dispositive.

This Court has found that when the initial seizure occurred the probable cause relied on

by law enforcement was barred by C.R.S. § 18-1-711(3). But the inquiry does not end there.

The facts in this case are that Defendant's residence was secured by law enforcement around

11:30 a.m. By 1:00 p.m. Detective Smith had learned of the types of substances L.E. possessed

and used and possessed probable cause of possible prescription fraud or theft crimes that are not

included in C.R.S.§ 18-1-711(3). That information provided Detective Smith with probable

cause to seize Defendant's residence independent of the possession and use of controlled

substances which is barred by C.R.S. § 18-1-711(3) and what was relied upon for the initial

seizure. The record shows that Defendant's common law wife arrived at the residence around

1:30 p.m. and was denied entrance.[5] The question becomes whether the initial seizure which

lasted approximately two hours and was reliant upon impermissible probable cause, infringed

upon Defendant's or Defendant's common law wife's possessory interest in the residence so as

to violate the fourth amendment protections from warrantless seizures even though Defendant

and his common law wife were unaware of the initial seizure?[6]

The Supreme Court has held that a "seizure" occurs "when there is some meaningful

interference with an individual's possessory interests in . . . property." *United States v.*

*Jacobsen,* 466 U.S. 109, 113 (1984). The *Jacobsen* Court did not state explicitly what types of

interest in property constitute the "possessory interests" with which there must be some

meaningful interference for a seizure to occur. However, if *Jacobsen* limits the fourth

amendment's protection against unreasonable seizures to persons who have actual physical

---

[5] The Government never challenged Defendant's assertion that Jessica Hayes was Defendant's
common law wife or what her rights in Defendant's residence may be.
[6] The record shows that Defendant did not return to the residence until sometime after 3:30 p.m.
and was denied entry by the deputies.

possession of the property at the time of governmental interference, the fourth amendment would only protect the right of present use and enjoyment of the property and would not provide protection for the right to the future use and enjoyment of property held by persons with constructive possession. The *Jacobsen* Court also did not explain why a fourth amendment seizure only occurs if there is a "meaningful" interference with possessory interests in property. Nor did the Court explain why the criterion of "meaningful" is relevant to the issue of whether a seizure has occurred, and not to the issue of whether a seizure was unreasonable. However, the *Jacobsen* Court did hold that the assertion by DEA agents of dominion and control over a cardboard box in taking custody of it for their own purposes constituted a seizure. *Id.* at 120. In reaching this holding, the majority in *Jacobsen* did not refer to how long a period of time the DEA agents asserted dominion and control. In fact, less than 10 minutes may have passed between the time that the first DEA agent on the scene picked up and inspected the contents of the box and the time that a DEA agent conducted the field test on the white powder found in the box. Consequently, this Court interprets the *Jacobsen* decision as holding that a seizure occurs when a government official asserts dominion and control over an item of personal property for even a brief period of time and whether Defendant has knowledge of the seizure is of no consequence as to whether a seizure has occurred.

This Court finds that a warrantless seizure occurred based on probable cause for an enumerated crime for which Defendant enjoyed immunity. The warrantless seizure allowed law enforcement time to continue to investigate and develop independent probable cause not subject to the immunity of C.R.S. § 18-1-711(3) but at the expense of infringing upon Defendant's possessory interest in his residence. The search warrant was reliant upon probable cause that was the result of an invalid seizure and therefore, this Court recommends exclusion of any

13

evidence obtained resulting from the search of Defendant's residence and vehicle. *Wong Son v. United States*, 371 U.S. 471, 484 (1963).

IV.     Conclusion

As set forth above, the Court **RECOMMENDS** the Defendant's Motion to Suppress evidence be **GRANTED** in its entirety.  Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).

**DATED** this 23rd day of March, 2022.

BY THE COURT:

James M. Candelaria, U.S. Magistrate Judge